LEIGH M. CLARK, Retired Circuit Judge.
This appellant was found guilty by a jury of sexual abuse in the first degree by subjecting “another person to sexual contact by forcible compulsion” as proscribed by Alabama Criminal Code, § 13A-6-66(a)(l), which by subsection (b) is classified as a Class C felony. The alleged victim was a fifteen-year-old girl whose name will not be given in this opinion so that any unnecessary embarrassment to her will be avoided.
The only witness presented by the State before it rested its case in chief was the alleged victim herself. She testified that she was a friend of appellant’s daughter, Angela Stiles, that on the afternoon of January 17, 1982, she went from her home to that of Angela’s in an automobile of the family of Angela, in which automobile were present the defendant, accompanied by a son of defendant by the name of Brian and a daughter of defendant by the name of Kelly. She further testified they arrived at the home of the Stileses about 6:30 and the following occurred:
“Q. And what, if anything, was going on there, at the house when you got there?
“A. When we got in, they started mixing drinks.
“Q. Who was mixing drinks?
“A. Brian and Coy.
“Q. Did you drink any?
“A. I drank a few sips of beer and Kelly.
*1191 “Q. How old is Kelly?
“A. Three years old.
“Q. Who gave her the beer?
“A. Coy.
“Q. How long were you there, at the Stiles house?
“A. About 20 minutes.
“Q. Did you leave then?
“A. Yes.
“Q. Who did you leave with?
“A. Coy, Brian, Angela and Kelly.”
She further testified that after they had ridden around they stopped at the trailer of the brother of defendant, where the witness and Angela stayed in the automobile for a short time and then went into the trailer. Her testimony continued as follows:
“Q. Who else was in the living room when you got in there?
“A. Coy and Brian and Kelly and Charlie.
“Q. Charlie, who?
“A. I don’t know his last name.
“Q. What did you do when you got into the living room?
“A. We sat down, I was on the arm of the chair.
“Q. Who was sitting in the seat of the chair?
“A. Angela.
“Q. Coy, and Brian and Kelly then, what happened?
“A. Well, Brian came up and grabbed me by the neck, and he tried to pick me up and I was holding on the handle, and he took me to the bedroom and threw me down onto some mattress.
“Q. Describe the room that he took you to, where was it, in relation to the living room?
“A. It was right next door.
“Q. Was it a poster bed or just a mattress?
“A. Just a mattress on the floor.
“Q. What happened after you were thrown down on the mattress?
“A. He started jumping down on me, and started trying to take my clothes off, and I was kicking and scratching, his daddy was holding my hands.
“Q. His daddy was holding your hands? “A. Yes.
“Q. And what did he do?
“A. His daddy kept trying to kiss me, trying to take my blouse off, and Brian kept trying to take my pants off.
“Q. Who is his daddy?
“A. Coy Stiles.
“Q. Is Coy Stiles here in the courtroom?
“A. Yes, he is. (Indicating the defendant.)”
The testimony of the girl continued along the same line for about a page of the transcript until the following testimony by the witness:
“Q. When you were leaving, and Coy Stiles placed his hands between your legs, was he in front of you or behind you?
“A. From behind.
“Q. Did he stick his hands between your legs at the knee or up in the crouch area?
“A. Up in the crouch [which we take, whether misspelled or not, as meaning ‘crotch’] area.
“Q. Did he say anything to you?
“A. He just laughed.
“Q. Okay. Then, what happened after you got to the door, at the trailer?
“A. We all got into the car — I mean, I was back into the car, and I got into the back seat; and I got real close to the door and we were leaving and going down a hill. And Coy and Angela said something, he stopped the car real fast, and I jumped out and when I did, Brian caught me and pushed me up against the car.
“Q. And then what happened?
“A. We got back in the car and they took me home.
“Q. What time was it when you got home?
“A. Around ten to ten.
*1192 “Q. That was at night?
“A. Yes.
“Q. And who was home when you got there?
“A. My brothers [naming them].
“Q. They are your brothers?
“A. Yes.
“Q. Did you tell them anything about what happened?
“A. No.
“Q. How come you didn’t tell anybody about what happened?
“A. I was too ashamed.”
A large part of the time the alleged victim was on the stand was consumed by remarks or questions of counsel for the respective parties in disagreement with each other in many particulars. We now quote from the transcript of the proceeding as to the testimony of the alleged victim as to what happened the next day, Monday, January 18:
“Q. After you got to school that morning, did you see Angela?
“A. Yes I saw her.
“Q. About what time was that?
“A. Beginning period started around ten to eight.
“Q. And when is it over?
“A. About five till nine.
“Q. All right. Did you stay at school that day?
“A. No.
“Q. Did Angela stay at school that day?
“A. No.
“Q. What did you all do?
“A. Nothing, we ran away.
“Q. How did you run away?
“A. We walked.
“Q. Where did you run to?
“A. We run to Louisiana.
“Q. What did you do when you got out on Highway 78?
“A. We started walking up it.
“Q. Started to go where?
“A. Walking.
“Q. Walking on Highway 78?
“A. Well, that man that let us out was in a red car, and we saw him coming back again, and he had some more people in the car with him, and this car came back. He asked us, ‘if we wanted a ride’ we said, ‘yes’, because we saw another car coming. He was coming off the ramp thing, because we saw him go over back down to get back on the Interstate in that silver, four-door station-wagon. And I guess, it was a Toyota stopped on a ride.
“Q. There was another man?
“A. Yes.
“Q. You all get in the car with him?
“A. Yes. We got in the back seat.
“Q. How far did you go with him?
“A. Louisiana.”
The first witness for the defendant was Brian Stiles. He contradicted the testimony of the alleged victim in every essential detail, including particularly the following:
“Q. Did you pick [the alleged victim] up and take her from the living room into that bedroom?
“A. No, sir.
“Q. Did you grab her or hold her or wrestle with her from the living room to the bedroom, to the back bedroom?
“A. No, sir.
“Q. Did you take her back into that bedroom there and throw her around onto some mattresses?
“A. No, sir.
“Q. Did you take her into that back bedroom there and throw her down onto some mattresses and try to take her pants off?
“A. No sir.
“Q. Did your father come out of this living room anytime that you were there, and go to any other room in there?
“A. When we first walked in, we walked into the back bedroom to see if my uncle was awake.
“Q. You walked back to the back bedroom?
“A. Yes.
“Q. Was that before [the alleged victim] and Angela had come inside?
*1193 “A. Yes sir, it was.
“Q. Now after your father went back to the back bedroom, did he ever leave that living room during the time that you all were in the trailer?
“A. No sir, he did not.
“Q. Did your father go into that bedroom at any time, the bedroom here (indicating) with [the alleged victim]?
“A. No sir.”
The defendant himself took the stand and emphatically contradicted the testimony of the alleged victim in every material respect, specifically including the following:
“Q. During that time, did you at any time, hold [the alleged victim’s] hands with your hands?
“A. I have never put my hands on her.
“Q. Did you at any time, kiss her or lick her on the neck or try to kiss her on the lips?
“A. No, sir.
“Q. Did you at any time, try to pull her down, try to unbutton or did unbutton some of her clothing?
“A. No, sir.”
He further testified:
“Q. When did you first learn, Mr. Stiles, that [the alleged victim] was charging you with sexual abuse?
“A. It was about a week* — a week and a half after that night.
“Q. Did you have an occasion to go to Louisiana?
“A. Yes, sir.
“Q. And what occasion was that?
“A. To get [the alleged victim] and my daughter.
“Q. And, who did you ride to Louisiana with?
“A. Sir.
“Q. What — who did you ride with?
“A. My father-in-law, my wife, [the alleged victim’s mother and the alleged victim’s father],
“Q. Now, on the trip down to Louisiana, was there any conversation between you and Mr. and Mrs. [the surname of the alleged victim] concerning any touching or sexual abuse of any kind with [the alleged victim]?
“A. No, sir.”
It is manifest from a reading of the entire testimony that at no time did defendant or Brian concede that there was any truth whatever in the testimony of the alleged victim as to the incident related by her in the trailer of defendant’s brother on the night of January 17, 1982. He was corroborated as to his innocence of any improper conduct toward the alleged victim on the particular occasion by the testimony of Robert Thrower, a joint occupant of the trailer of defendant’s brother, who testified he was in the trailer during the particular time defendant and the alleged victim were present and that there was no misbehavior of the kind the alleged victim described.
The next witness called by defendant after Mr. Thrower had testified was Mrs. Alvenia Stiles, wife of defendant. There was considerable controversy between attorneys for the respective parties while Mrs. Stiles was on the witness stand. Much of it was as to whether her presence in the courtroom during the previous part of the trial precluded her from testifying. She testified that on the Wednesday following January 17, 1982, the alleged victim called her and that on the way with the alleged victim to the school in an automobile driven by Mrs. Stiles the following occurred:
“A. She [the alleged victim] said that, ‘she was worried about Angela and I told her I was, too. And she says, ‘Well, I told a story cause I couldn’t sleep last night about it,’ and I said, ‘what did you tell a story about?’ She said, ‘That Brian didn’t try to put his hands on nobody but said, he tried to put his hands on me.’ And I said, ‘Well, did he succeed?’ And she said, ‘No, I told him that I was going to tell you,’ and she said, ‘He stopped.’ I said, ‘Well, [calling the given name of the alleged victim], did Coy put his hands on you? She said, ‘No.’ I said, ‘Did Coy put his hands on Angela?’ She said, ‘No.’ I said, ‘But you are telling me that Brian made advances toward you,’ and *1194 she said, ‘Yes ma’am.’ And I said, ‘What are you going to do about it?’ She said, ‘Well I’m tell you, what are you going to do about it?’ I said, ‘Well, I’ll handle Brian when he comes home from school this afternoon.’ ”
Thereupon, cross-examination of the witness commenced, which lasted for about one page of the transcript, and for about twenty-five pages of the transcript thereafter there were chiefly expressions by the attorneys, interspersed by a few statements of the trial judge, as to what the witness would testify as to relations between the defendant and Angela Stiles. Some of the statements were made while the jury was present in the courtroom; others were made while the jury was excused from the courtroom.
The parties by their attorneys on appeal are in apparent agreement that during the time Mrs. Stiles was on the witness stand, and while the jurors were present and listening, efforts were made by the prosecuting attorney to show that within a few weeks of January 17, 1982, the defendant had sexually abused Angela. In this connection it should be noted that there was some evidence in the case indicating, if not definitely showing, that defendant was the stepfather, rather than the father by blood of Angela. During a part of the same time that Mrs. Stiles was on the witness stand, some of this discussion concerning the contention of the State that defendant had sexually abused Angela came to the attention of the jury against the protests of defendant’s attorney, and defendant’s attorney moved for a mistrial by reason thereof, which was overruled by the trial court.
Angela Stiles testified as a final witness for the defendant. She stated she was present in the trailer of defendant’s brother on the night of January 17, 1982, at the time of the alleged incident made the basis of the prosecution against defendant and that no such incident as the alleged victim testified occurred. She stated specifically that defendant did not “get up and leave the living room at any time while” she was there, “for the whole period.” She further testified at length that when she returned to her home that night, she had a telephone call from the alleged victim asking that the victim be allowed to come to Angela’s home and spend the night, that after receiving the telephone call she begged her mother and father to let her come and spend the night, to which they finally agreed. Her testimony continued as follows:
“Q. Who went back to get [the alleged victim]?
“A. Me, Kelly, Brian and Daddy.
“Q. Did you then, bring her back to your house?
“A. Yes, sir.
“Q. Did she spend the night with you?
“A. Yes, sir.
“Q. What, if anything, did you all do Monday morning?
“A. We went with my grandparents and my mother to Bargain Town.
“Q. Is that over in Talladega?
“A. Yes, sir.
“Q. Did you ask [the alleged victim] to give you something for a headache?
“A. Yes, sir.
“Q. Did [the alleged victim] give you some sort of pills?
“A. Yes, sir.”
We quote further from the following parts of Angela’s testimony:
“Q. And did you recognize these drugs that [the alleged victim] had given you?
“A. Yes, sir.
“Q. And what did you recognize them to be?
“A. Quaaludes.
“Q. Now, after taking those pills, or about what time was it — to your best judgment, about what time did you take those last pills?
“A. I would say around dinner time, some time around like that.
“Q. Did you later go to church that evening?
“A. Yes.
“Q. Where did you go to church?
“A. At Antioch.
*1195 “Q. What, if anything, happened, after you got to church?
“A. I went crazy.
“Q. Tell the ladies and gentlemen of the Jury, what did you do?
“A. I said that Brian and my father had raped me.
“Q. Speak up.
“A. I lost my mind and said my father had raped me.
“Q. Had your father raped you?
“A. No, sir.
“Q. Had your father raped, or attempted, in any way to touch you in a sexual manner?
“A. No, sir.
“Q. Your physical and mental condition was [sic] at the church, just before they took you to the hospital?
“A. If I remember, I just don’t, I — I went crazy, I just don’t know what I was doing; some weird feelings — I just don’t know what I was doing.
“Q. Now, after being at the hospital, did you come back home, after that?
“A. After that? No, sir.
“Q. You went to the hospital on Monday night, did you go to school on Tuesday or Wednesday?
“A. Yes sir.
“Q. Was school out on Tuesday?
“A. Yes.
“Q. Now, on Wednesday, did you see [the alleged victim]?
“A. Yes.
“Q. Did you have a conversation with her?
“A. Yes.
“Q. Tell the Ladies and Gentlemen, what you all talked about.
“A. We went, and we talked about what I had to do, and the next thing you know, she and I, we were going to run away.
“Q. Would you speak up a little louder, please.
“A. We went to school, we talked about what my daddy — we said we would run away, and then I said, Well, I want to — ’ Well, the next thing I know, we were just running away.
“Q. After talking about running away, did [the alleged victim] go make the telephone call?
“A. Yes.
“Q. Were you all picked up by a man about thirty years old, about that age?
“A. Yes.
“Q. Where did you all go to after that man had picked you up?
“A. We went to Louisiana, that’s where we wound up.
“Q. Did your father and your mother, and Mr. and Mrs. [surname of the alleged victim] come to get you?
“A. Yes, sir.
“Q. And did they then bring you back home?
“A. Yes, sir.
“Q. Was it after that, that [the alleged victim] complained or make a complaint that your father had sexually abused her?
“A. Yes, sir.”
On cross-examination of Angela, she was asked about a conversation she had had with Mrs. Peebles, “a social worker for the Department of Pensions and Security.” The following was her testimony as to her conversation with Mrs. Peebles:
“Q. Do you remember telling Mrs. Pee-bles that Brian picked her up from the chair, in the living room, and put her down on the mattress?
“A. No, ma’am.
“Q. Do you remember telling Mrs. Pee-bles that the mattress was on the floor, in the bedroom?
“A. No, ma’am.”
After being intensively interrogated by counsel for the State, the witness was excused and thereupon the defendant rested its case and Mrs. Teresa Peebles was called as a witness in rebuttal by the State. Mrs. Peebles testified on direct examination by the State. The following is the conclusion of her testimony on direct examination:
*1196 “Q. Let me ask you back to the conversation with Angela, on the 25th [January 1982], whether or not she made any statement to you about alcohol consumption, either by herself or by others in her presence, on the 17th [January 1982].
“A. Yes, she did.
“Q. What, if anything, did she say to you, in regard to drinking any liquor on that occasion?
“A. She said that both Mr. Stiles and Brian had been drinking at home before they went to the trailer. She at first said that she had not had anything to drink herself, and she later amended that to say that she had beer; she said at the trailer Mr. Thrower was drinking, and Mr. Stiles and Brian were drinking, and that Mr. Troy Stiles was passed out in the bedroom drunk.
“Q. Drunk?
“A. Yes.
“Q. Did she relate to you, in your conversation of the 25th, any information concerning the use of marijuana on the 17th?
“A. I asked her something about that, and she answered my question. She did not give me that information before I asked her.
“Q. What did you ask her?
“A. I asked her if her father and Brian had been smoking marijuana and if she also had smoked marijuana at her house, not at the trailer.
“Q. And what did she say?
“A. Her father and Brian had smoked she added, and later she said she had one puff of the marijuana cigarette and she [sic] to have a puff.
“Q. The three-year-old had been allowed to use marijuana?
“A. Yes.
“Q. Any time, in your conversation, did she initiate a conversation with you, concerning the use of Quaaludes?
“A. No.
“Q. During your conversation with her on that day, did she relate to you any reason for running away to Louisiana or from the shelter home? I mean, for their ending up in Louisiana?
“A. She said that everyone in school knew the allegations that had been made regarding the complains we had received regarding her — Angela.”
On cross-examination of Mrs. Peebles, it was immediately shown by her testimony that she made a written report of the conversation she had with Angela, which was contained in the file she had at the time she testified, which counsel for defendant asked to see. Thereupon, the following occurred:
“A. I can give the files to the Judge.
“MS. ROBERTS [Assistant District Attorney]: I think, she didn’t use her files—
“MR. SIMS [Defendant’s attorney]: But she does have to conform to the rules of the Agency, and if Your Honor wants to take them, hand them over with that satisfaction — would that be satisfactory, Ms. Peebles?
“WITNESS: The reason I came, because the name of the person making the complaint is in the file.
“MS. ROBERTS: I would be happy to let Mr. Sims see the notes—
“MR. SIMS: I’d like to see her record, which she had testified from.
“WITNESS: That is the complaint regarding Angela, that we received — and this is a complaint of [the alleged victim].
“THE COURT: I’ll allow you to see the statement, but I don’t see how you are going to be able to straighten this. (Referring to notes).
“WITNESS: Deleting the name and then, I was told I could give the original file to you. I have a copy I have probably written some notes out to the side, and there is a couple — there is a copy on Angela’s.
“THE COURT: Is that the same statement on the names that is blotted out?
“WITNESS: Yes.
“THE COURT: All right. I’m going to allow the Defense to look at this copy with those names deleted.
*1197 “MR. SIMS: May we have just a minute, just probably five minutes to look this over?
“THE COURT: All right, go ahead.
“MS. ROBERTS: Just — Your Honor, before — may I ask her another question — I would like to ask her another question.
“THE COURT: All right. Mr. Sims, do you have any objection, that she be allowed to ask another question.
“MR. SIMS: Yes, sir. I do object. I can’t concentrate on reading this at the same time.
“MS. ROBERTS: I’ll wait.
“Whereupon Mr. Sims paused to read the document, after which cross-examination continued.”
The transcript shows the following as the conclusion of defendant’s cross-examination of the witness:
“Q. Was she — she also stated that at the trailer, Mr. Stiles and Brian had been drinking liquor that was clear white in color, is that correct?
“A. Yes, sir.
“Q. Angela confirmed this, and eventually did admit that she had been drinking beer, too.
“(Whereupon portions of Ms. Peebles’ notes were quoted as follows:)
“She stated that, ‘Brian had been picking on her and her father began to take Brian’s side of the argument. Then he began to shove her around and her father began to do the same; they shoved her into the bedroom, and she stated that she was raped by both of them. She stated that Mr. Stiles raped her first, and then Brian raped her. She stated that her — Mr. Stiles, what he would do if she told, and that he would not do it again;’ is that correct?
“A. That’s correct, she said that to me.
“Q. Yes?
“A. Yes.
“Q. And, this is part of the conversation on January 25th, in your automobile?
“A. Yes.
“Q. So, in fact, she said she was raped?
“A. No, sir; not at the trailer, at her home.
“Q. Now, let me read this. She said, ‘She stated at the trailer, Mr. Stiles and Brian had been drinking beer. She stated that Brian had began picking on her and her father began to take Brian’s side of the argument.’
“A. That might be re-worded — but she did not tell me that it happened at the trailer. I do not intend for it to sound that it happened at the trailer.
“Q. What you want to read it?
“A. I’m sure you are reading correctly.
“(Whereupon Counsel gives notes to the witness to read).
“A. That is confusing, and it should not be — she did not indicate that — that—that happened at the trailer.
“MR. SIMS: That’s all I have, Judge.”
Following immediately thereafter is the following portion of the transcript of the proceedings:

“BY MS. ROBERTS:

“Q. Are you familiar with the characteristics of the person who is under the influence of any kind of intoxicating drug?
“A. I’ve seen people who are — I don’t know.
“Q. On the 25th of January, when you talked with Angela, did she give you any reason that she was under the influence of any kind of drug or intoxicant when you all were talking?
“A. No.
“MS. ROBERTS: That’s all I have.
“THE COURT: You may be excused.
“THE COURT: Ladies and Gentlemen, all the evidence is in, for both sides. Counsel, how long do you all wish to argue the case?”
Notwithstanding the uncertainty that arises from a reading of the transcript of the proceeding as to whether or not, and, if so, where and when defendant unsuccessfully invoked a ruling from the trial court to decline to permit any testimony as to sexual misconduct by defendant prior to the incident made the basis of the indict *1198 ment in the instant case, we are reasonably confident that defendant’s counsel made it known to the trial court that defendant was objecting to or protesting against the admission of such evidence. No point is made otherwise by counsel for appellee. The first issue presented by appellant is thus stated in his brief:
“Is the Appellant’s Conviction due to be reversed because of the interjection by the State by [sic] prior acts of misconduct on the part of the defendant?”
In the brief of counsel for appellee, we find the caption of the only “STATEMENT OF THE ISSUE” as follows:
“WHETHER OR NOT THE EVIDENCE INTRODUCED BY THE STATE CONCERNING APPELLANT’S PRIOR ACTS OF SEXUAL MISCONDUCT CONSTITUTES REVERSIBLE ERROR?”
Both parties cite as the first authority, Cofer v. State, 440 So.2d 1116 (Ala.Cr.App.), aff’d in part, rev’d in part, 440 So.2d 1121 (Ala.1983), on remand, 440 So.2d 1125 (Ala.Cr.App.1983).
We agree with each of the parties on appeal, that the Cofer case is dispositive of the pivotal issue presented by the parties in the instant case. It was not held by either appellate court in Cofer that evidence of the commission by the defendant of prior sexual misconduct on his part was admissible against defendant to show his criminal intent in a case, such as this, in which all the evidence on behalf of defendant and witnesses called by him was in denial of essential physical facts shown by the evidence presented by the State. Unlike the instant case, the appellant in Cofer “admitted the confrontation and the presentation of his case, but denied any sexual intent or abuse,” 440 So.2d 1120, in the opinion of the Alabama Court of Criminal Appeals. The difference between the two appellate courts as to the sole issue presented in the instant case is that the Court of Criminal Appeals deemed that evidence as to the previous misconduct was relevant to the question of defendant’s criminal intent at the time of the conduct for which he was being tried, while the Supreme Court was of a contrary view, as shown by its statement at 440 So.2d 1124, “There is, therefore, no real and open issue about his intent, and the evidence of the prior rape was erroneously allowed to prove Cofer’s intent.” Cofer, the defendant, admitted the act that the prosecutrix said he committed, but denied any criminal intent. In the instant case, the defendant and all of the eyewitnesses who testified for the defendant, denied the physical facts testified to by the prosecuting witness.
It follows that, in accordance with what was held by the Alabama Supreme Court in Ex Parte Cofer, supra, the judgment of the trial court in this case should be reversed and the cause remanded for another trial.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
All the Judges concur.